# UNITED STATES DISTRICT COURT

## DISTRICT OF MAINE

| | |
|---|---|
| **BERNARD AND NANCY CARSON,** ) | |
| ) | |
| PLAINTIFFS ) | |
| ) | |
| v. ) | |
| ) | |
| **OCWEN LOAN SERVICING LLC, THE** ) | |
| **BANK OF NEW YORK MELLON** ) | |
| **F/K/A THE BANK OF NEW YORK** ) | CIVIL NO. 2:15-cv-514-DBH |
| **AS SUCCESSOR TO TRUSTEE FOR** ) | |
| **THE BENEFIT OF THE** ) | |
| **CERTIFICATEHOLDERS OF** ) | |
| **POPULAR ABS, INC. MORTGAGE** ) | |
| **PASS-THROUGH CERTIFICATES** ) | |
| **SERIES 2005-C, LITTON LOAN** ) | |
| **SERVICING LP,** ) | |
| ) | |
| DEFENDANTS ) | |

## DECISION AND ORDER ON MOTIONS

This case involves Maine homeowners' attempts to reduce their monthly mortgage payments under the federal government's Home Affordable Modification Program (HAMP). The crux of the dispute is whether Bernard and Nancy Carson and their lender, through its agents, ever entered into a binding Modification Agreement with respect to the Carsons' loan. The defendants Litton Loan Servicing and Ocwen Loan Servicing LLC consecutively serviced the loan; the current holder of the note and mortgage is The Bank of New York Mellon f/k/a The Bank of New York as successor trustee for JPMorgan Chase Bank, N.A., as Trustee for the benefit of the Certificateholders of Popular ABS, Inc.

Mortgage Pass-Through Certificates Series 2005-C.   I will refer to them respectively as Litton, Ocwen, and Bank of New York.

After oral argument on March 16, 2017, I **GRANT** the plaintiffs' motion to file a surreply (ECF No. 59).   At the argument, the defendants were able to address any issues in the surreply (ECF No 59-1) that they desired.   I **DENY** the plaintiffs' motion for summary judgment (ECF No. 38), and I **GRANT IN PART** the defendants' motion for summary judgment (ECF No. 45).   Genuine issues of material fact remain for most of the claims at trial.

## FACTS

Where the facts are disputed, I will say so, and I will take the version favorable to the nonmoving party.   I also address more facts and factual disputes later in this opinion when they are material to particular issues.

In 2005, the Carsons signed a Note for $250,000 secured by a Mortgage on their Saco home.[1]   The Note called for monthly principal and interest payments of $1,588.40 plus an escrow for taxes and insurance.[2]   In 2006, the Carsons filed for Chapter 13 Bankruptcy in this District.[3]

On November 1, 2008, Litton began servicing the loan.[4]   In 2009, Bank of New York (or its predecessor) took an assignment of the Note and Mortgage.[5]   In

---

[1] Pls.' Statement of Material Facts ¶ 1 (ECF No. 47) (Pls.' SMF); Defs.' Response to Pls.' Statement of Material Facts ¶ 1 (ECF No. 52) (Defs.' RSMF).

[2] Defs.' Statement of Additional Material Facts ¶¶ 1, 3 (ECF No. 52) (Defs.' SAMF); Pls.' Response to Defs.' Statement of Additional Material Facts ¶¶ 1, 3 (ECF No. 55) (Pls.' RSAMF).

[3] Defs.' SAMF ¶ 7; Pls.' RSAMF ¶ 7.

[4] The parties agree that the original lender, Popular, serviced the loan from its inception until October 31, 2008.   Defs.' SAMF ¶¶ 6, 8; Pls.' RSAMF ¶¶ 6, 8.

[5] Pls.' SMF ¶ 3; Defs.' RSMF ¶ 3.

September 2011, Ocwen acquired Litton and assumed Litton's obligations.[6] Ocwen has serviced the loan since 2011.[7]

On account of ongoing financial difficulties, the Carsons asked Litton in 2010 to request a solicitation package for the federal government's Home Affordable Modification Program (HAMP).[8]  They submitted a HAMP Request for Modification and Affidavit that same year to Litton.[9]  Litton approved the Carsons for a Modification Agreement on January 6, 2011,[10] and in April delivered a Commitment Letter dated April 19 together with a document entitled Home Affordable Modification Agreement.[11]  The Commitment Letter offered to reduce the amount of the interest-bearing principal and to reduce the monthly payment on the Note to $1,435.75, not counting the monthly escrow payment[12] and to modify the terms of the Note and Mortgage accordingly.[13]  Although these documents were dated in April of 2011, the Modification Agreement said it would be effective starting February 1, 2011, with the first modified payment due on March 1, 2011.[14]

---

[6] Pls.' SMF ¶ 6; Defs.' RSMF ¶ 6.

[7] Pls.' SMF ¶ 5; Defs.' RSMF ¶ 5.

[8] Defs.' SAMF ¶ 10; Pls.' RSAMF ¶ 10.

[9] Defs.' SAMF ¶ 12; Pls.' RSAMF ¶ 12.

[10] Pls.' SMF ¶ 13; Defs.' RSMF ¶ 13

[11] Pls.' SMF ¶ 15; Defs.' RSMF ¶ 15.  The defendants claim that the interval was due to the Carsons' delay in providing a signed Dodd-Frank Certification.  Defs.' Statement of Material Facts ¶¶ 29–30 (ECF No. 46) (Defs.' SMF); Declaration of Nicole M. Gostebski ¶¶ 35–36 (ECF No. 46-1).  The plaintiffs deny these statements of fact and object based on lack of foundation, contending that Ms. Gostebski, a senior loan analyst at Ocwen Financial Corporation, cannot testify regarding Litton's records or Litton's state of mind when the Carsons submitted their application.  Pls.' Response to Defs.' Statement of Material Facts ¶¶ 35–36 (ECF No. 50) (Pls.' RSMF).  The reason for the interval is not material to my decision.

[12] The parties disagree over the original amount of the escrow payment—$445.33, Defs.' RSMF ¶ 17, or $412.05, Pls.' SMF ¶ 17—but the dispute is not material to this decision.

[13] Pls.' SMF ¶ 16; Defs.' RSMF ¶ 16; Defs.' SAMF ¶ 32; Pls.' RSAMF ¶ 32.

[14] Pls.' SMF ¶ 18; Defs.' RSMF ¶ 18.

Litton's Commitment Letter said that it was Litton's "offer to modify the referenced loan, subject to" stated "terms and conditions."[15]   In bold type it stated:  "If you choose to accept this offer, you must sign this letter and return by May 3, 2011.  Failure to do so will result in the automatic withdrawal of the modification letter without further notice."[16]   The Commitment Letter also said that Litton "offer[ed] to modify the Note and Mortgage . . . (as modified it will be called the 'Modified Mortgage'), listed "Terms of Modification" and "Contingencies,"[17] and said:

> If you choose to accept the offer for a Modified Mortgage upon the terms and conditions above, you must agree by signing the acceptance that follows this offer.  The acceptance must be signed by each mortgagor and returned by May 3, 2011, or the offer will expire.[18]

Attached was a document entitled "Home Affordable Modification Agreement (Step Two of Two-Step Documentation Process),"[19] which elaborated on all the ways in which the Note and Mortgage would be amended.  It also stated:  "I understand that after I sign and return two copies of this Agreement to the Lender, the Lender will send me a signed copy of this Agreement."[20]   The Lender

---

[15] April 19, 2011 Commitment Letter, Deposition of Crystal M. Kearse, Ex. 2, at 1 (ECF No. 47-7) (Commitment Letter).
[16] Id.
[17] Section C, "Contingencies," provided:  "If any other issues arise between the date of this commitment and the date on which the documents for the Modified Mortgage are signed, including, but not limited to, deterioration in the condition of the property, lawsuits, liens, additional expenses, and defaulted amounts, we may refuse to permit the Mortgage to be modified and will pursue all collection action."  Id. at 3.  The defendants have not argued that any of the listed contingencies occurred.
[18] Id. at 1.
[19] Defs.' SMF ¶ 37; Pls.' RSMF ¶ 37; Home Affordable Modification Agreement, Dep. of Crystal M. Kearse, Ex. 2 (ECF No. 47-7) (HAMP Agreement).  Step One would have been a trial payment plan, but due to the Carsons' active Chapter 13 bankruptcy, Litton determined that the Carsons could skip the trial payment plan and proceed straight to a final modification.  See Defs.' SMF ¶¶ 26–27; Pls.' RSMF ¶¶ 26–27.
[20] HAMP Agreement at 1.

was defined as "Servicer" or Litton.[21]  No conditions were listed for that obligation on the part of the Servicer.  The Carsons timely signed and returned the Commitment Letter, thereby accepting the offer to modify the loan, Note and Mortgage, along with the attached Modification Agreement, returning both documents to Litton on April 27, 2011.[22]  Litton received them on the deadline, May 3, 2011.[23]  However, Litton did not return to the Carsons a signed copy of the Agreement as promised.[24]

The Carsons then began making payments according to the modification.[25] But Litton never implemented the terms of the Modification Agreement.[26]  Before the Carsons obtained bankruptcy court approval, Litton transferred servicing of the loan and the Carsons' signed Modification Agreement to Ocwen on September 1, 2011.[27]  Litton incorrectly reported the loan to Ocwen as "HAMP APPLICATION RECEIVED BY PRIOR SERVICER AND IS NOT DECISIONED YET," and Ocwen retained this same code upon the transfer.[28]   On September 23, 2011, the Carsons filed a motion in the bankruptcy court to approve the loan modification.[29]  They sent notice of the motion to Litton,[30] but

---

[21] Id.
[22] Defs.' SAMF ¶ 43; Pls.' RSAMF ¶ 43; Commitment Letter at 1, 3.
[23] Defs.' SAMF ¶ 44; Pls.' RSAMF ¶ 44.
[24] Defs.' SMF ¶ 43; Pls.' RSMF ¶ 43; HAMP Agreement at 2.
[25] Pls.' SMF ¶ 21; Defs.' RSMF ¶ 21.
[26] Pls.' SMF ¶ 25; Defs.' RSMF ¶ 25.  The defendants say that Litton was awaiting bankruptcy court approval, Declaration of Nicole M. Gostebski ¶ 48 (ECF No. 46-1), but the Carsons challenge the foundation for that assertion since it is made by Ms. Gostebski, an employee at Ocwen Financial Corporation but not a Litton employee, see Defs.' SMF ¶ 43; Pls.' RSMF ¶ 43. The reason for the delay in signing and returning the documents before Litton transferred servicing of the Loan is not material to my decision.
[27] Pls.' SMF ¶¶ 24, 26–27; Defs.' RSMF ¶¶ 24, 26–27.
[28] Pls.' SMF ¶¶ 28, 30; Defs.' RSMF ¶¶ 28, 30.
[29] Defs.' SAMF ¶ 54; Pls.' RSAMF ¶ 54.
[30] Pls.' SMF ¶ 33; Defs.' RSMF ¶ 33.

not directly to Ocwen.[31]  Ocwen made its appearance in the bankruptcy court on October 11, 2011, when it filed a Transfer of Claim for Security in the Carson's bankruptcy.[32]   The bankruptcy court granted the Carsons' motion on October 31, 2011.[33]  Ocwen received a copy of the bankruptcy court's order on November 15, 2011.[34]

In the meantime, treating the Carsons' original modification request as not yet approved, Ocwen sent the Carsons a letter requesting additional documentation by October 29, 2011, including an updated HAMP Request for Modification and Affidavit and paystubs, so that, from its perspective, the application could be finalized.[35]  Ocwen sent the Carsons additional letters on November 1 and 18, 2011, requesting these same documents for purposes of the HAMP application.[36]  On December 13, 2011, Ocwen sent the Carsons a letter informing them that, based on a review of the documents they had provided, they were not eligible for a HAMP modification.[37]

On July 18, 2012, the Carsons filed in the bankruptcy court a Motion to Determine Status of Mortgage as Current.[38]  They sent notice of the motion's filing to Ocwen.[39]  The bankruptcy court granted their motion, determining the mortgage current on August 20, 2012.[40]  Around that same date, Ocwen received

---

[31] Defs.' SAMF ¶ 55; Pls.' RSAMF ¶ 55.
[32] Pls.' SMF ¶ 40; Defs.' RSMF ¶ 40.
[33] Defs.' SAMF ¶ 58; Pls.' RSAMF ¶ 58.
[34] Defs.' SAMF ¶ 62; Pls.' RSAMF ¶ 62.
[35] Defs.' SAMF ¶ 56; Pls.' RSAMF ¶ 56.
[36] Defs.' SAMF ¶¶ 60, 63; Pls.' RSAMF ¶¶ 60, 63.
[37] Defs.' SAMF ¶ 65; Pls.' RSAMF ¶ 65.
[38] Pls.' SMF ¶ 62; Defs.' RSMF ¶ 62.
[39] Pls.' SMF ¶ 70; Defs.' RSMF ¶ 70.
[40] Pls.' SMF ¶ 69; Defs.' RSMF ¶ 69.

notice of the bankruptcy court's order determining that the mortgage was current.[41]  But Ocwen did not change its treatment of the loan status.[42]  On August 28, 2013, the bankruptcy court entered the Carsons' Chapter 13 Order of Discharge, with notice to Ocwen.[43]

From November 2011 to March 2015, Mr. Carson and his housing counselor contacted Ocwen at least nineteen times attempting to straighten things out, to clarify that the Carsons had already accepted the proposed loan modification and to request that the terms of the modification be implemented.[44] Ocwen never raised the failure to promptly obtain bankruptcy court approval or the lack of the Servicer's signature as the reason for failure to honor the modification.  During this time period, the Carsons generally made monthly payments according to the Modification Agreement,[45] but Ocwen treated the payments according to the original terms of the Note and Mortgage, as if there had been no Modification Agreement.[46]  Because the payments did not satisfy the unmodified terms, Ocwen's system placed the payments in a suspense account and showed that the Carsons were late on their payments.[47]

Accordingly, Ocwen sent the Carsons a letter indicating that it had not received payments for December 1, 2014 and January 1, 2015, followed by a

---

[41] Pls.' SMF ¶ 71; Defs.' RSMF ¶ 71.

[42] Pls.' SMF ¶¶ 74, 77; Defs.' RSMF ¶¶ 74, 77.

[43] Pls.' SMF ¶ 81; Defs.' RSMF ¶ 81.

[44] Pls.' SMF ¶ 57; Defs.' RSMF ¶ 57.

[45] Pls.' SMF ¶ 92; Defs.' RSMF ¶ 92.  It appears that the Carsons failed to make any monthly payments in November 2012 and March 2013, Defs.' RSMF ¶ 59; Pls.' SMF ¶ 59, although the Carsons say they made all payments, and the defendants deny that assertion as to November 2012 and March 2013, Pls.' SMF ¶ 61; Defs.' RSMF ¶ 61.  The dispute is not material to my decision.

[46] Pls.' SMF ¶ 60; Defs.' RSMF ¶ 60.

[47] Pls.' SMF ¶¶ 92–93; Defs.' RSMF ¶¶ 92–93.

delinquency notice and a notice of default in February of 2015.[48]   Ocwen subsequently sent letters in March and April, informing the Carsons that it had not received payments and that it might refer the loan to foreclosure.[49]  In April, Ocwen sent the Carsons another notice of default, again advising of potential foreclosure if they did not provide payment.[50]  Afraid of losing their home, the Carsons paid Ocwen $5,546.61 on May 6, 2015 and subsequently made increased payments of approximately $2,080 per month.[51]

On September 16, 2015, the Carsons' lawyer sent Ocwen a letter claiming that Ocwen and Litton's "gross pattern and practice of ongoing misconduct was in violation of at least the FDCPA, RESPA, UTPA, Maine Consumer Credit Code, 11 U.S.C. § 362 and 11 U.S.C. § 524 for which the Carsons are entitled to actual, compensatory, punitive, and statutory damages."[52]  On June 14, 2016, Ocwen implemented most of the terms of the Modification Agreement.[53]  Following application of all the payments, Ocwen applied any remaining money on the Carsons' account to the principal.[54]

### PROCEDURAL HISTORY

The Carsons filed this lawsuit on December 17, 2015.[55]  According to the Amended Complaint,[56] they make twelve claims against the defendants:  Count One, violation of the bankruptcy court automatic stay, 11 U.S.C. § 362 (Ocwen

---

[48] Pls.' SMF ¶¶ 94–96; Defs.' RSMF ¶¶ 94–96.
[49] Pls.' SMF ¶¶ 99, 104; Defs.' RSMF ¶¶ 99, 104.
[50] Pls.' SMF ¶ 105; Defs.' RSMF ¶ 105.
[51] Pls.' SMF ¶ 106; Defs.' RSMF ¶ 106.
[52] Defs.' SAMF ¶ 71; Pls.' RSAMF ¶ 71.
[53] Pls.' SMF ¶ 120; Defs.' RSMF ¶ 120.
[54] Pls.' SMF ¶ 120; Defs.' RSMF ¶ 120.
[55] Compl. (ECF No. 1).
[56] Am. Compl. (ECF No. 13).

and Bank of New York); Count Two, violation of the bankruptcy court discharge injunction, 11 U.S.C. § 524 (Ocwen and Bank of New York); Count Three, violation of the Fair Debt Collection Practices Act (FDCPA), 15 U.S.C. § 1692 (Ocwen); Count Four, violation of the Maine Fair Debt Collection Practices Act (MFDCPA), 32 M.R.S. § 11001 (Ocwen); Count Five, illegal, fraudulent or unconscionable conduct in attempted collection of debts in violation of the Maine Consumer Credit Code (MCCC), 9-A M.R.S. §§ 9-403(1)(F)&(G) (Ocwen and Bank of New York); Count Six, violation of the Maine Unfair Trade Practices Act (UTPA), 5 M.R.S. § 205-A (all defendants); Count Seven, violation of the Real Estate Settlement Procedures Act (RESPA), 12 U.S.C. § 2605 (Ocwen);[57] Count Eight, intentional infliction of emotional distress (IIED) (Ocwen and Bank of New York); Count Nine, fraud (Ocwen and Bank of New York); Count Ten, fraudulent misrepresentation (Ocwen and Bank of New York); Count Eleven, breach of contract (all defendants); and Count Twelve, promissory estoppel (all defendants).

The Carsons moved for summary judgment as to liability on all but the emotional distress count, requesting a trial on damages (ECF No. 38).   The defendants moved for summary judgment on all counts (ECF No. 45).

## ANALYSIS

The parties agree that the enforceability of the original 2011 HAMP documents affects a number of counts.  I therefore deal with that issue first.

---

[57] The Amended Complaint says that the plaintiffs are bringing Count Seven against only Ocwen. Am. Compl. ¶¶ 149–56 (ECF No. 13).  In their motion for summary judgment, however, the plaintiffs suggest that Count Seven also includes Bank of New York under an agency theory. Pls.' Mot. Summ. J. 33–34 (ECF No. 38).  In the absence of a motion to amend further, I follow the Amended Complaint.

*Enforceability of the 2011 HAMP Documents*

The Carsons argue that they accepted Litton's Commitment Letter offer by signing both it and the attached Modification Agreement as Litton requested, and thereby entered into an enforceable loan modification in 2011.  The defendants argue that the Carsons failed to satisfy two preconditions to the contract—first, promptly obtaining bankruptcy court approval; and, second, obtaining the Lender/Servicer's signature on the Modification Agreement.  They also argue that Mr. Carson made a material misrepresentation that made the modification unenforceable in any event.

The Commitment Letter does call for bankruptcy court approval.[58]  But the Carsons obtained bankruptcy court approval later in 2011.  There was no time limit in the documents for that approval, and none of the defendants ever attempted to rescind the Modification Agreement for lack of bankruptcy court approval (or for any other reason).  On the undisputed facts, that condition was satisfied.[59]

As I stated earlier, the Modification Agreement provides that after the Carsons sign and return two copies to Litton, the Lender (defined as the Servicer

---

[58] It actually states that the "*Mortgage* will be modified to reflect the following terms" (emphasis added) and lists as one of eight bullet-point terms that "[t]he mortgagor must . . . obtain approval of this loan modification by the bankruptcy court."  Commitment Letter at 2.  Given the language that bankruptcy court approval is a revised term of the modified mortgage, it is hard to see how bankruptcy court approval is a "pre-condition" to the modification, but I will overlook the sloppy drafting.

[59] As I noted earlier, Section C of the Commitment Letter also stipulates:  "If any other issues arise between the date of this commitment and the date on which the documents for the Modified Mortgage are signed, including, but not limited to, deterioration in the condition of the property, lawsuits, liens, additional expenses, and defaulted amounts, we may refuse to permit the Mortgage to be modified and will pursue all collection action."  Commitment Letter at 3.  The record, however, does not contain any indication that the Carsons failed to satisfy the identified contingencies in Section C, nor have the defendants made any argument that the Carsons did not comply with Section C.

10

or Litton) "will send me a signed copy of this Agreement."[60]  There is no listed condition for that obligation on the Servicer to sign and return the document. But Litton and its successor Ocwen never signed and returned the document as this provision required.  The defendants argue that there were two reasons the Servicer did not sign.[61]  First, that the Carsons were slow in obtaining bankruptcy court approval, and second, that they did not respond to Ocwen's requests for more financial information.  Neither of these is a listed reason justifying failure to sign.[62]  Moreover, there was no deadline for bankruptcy court approval, and the new information that Ocwen requested was "to complete the application process,"[63] whereas Litton had already approved the Carsons' application.  Neither was a proper justification for failing to sign and return the Modification Agreement.

However, the document goes on to say:  "This Agreement will not take effect unless the preconditions set forth in Section 2 have been satisfied."[64]  There are two "Acknowledgments and Preconditions" in Section 2.  The first is that the Servicer not find before the Modification Effective Date, February 2, 2011, that certain representations and covenants are not true and correct or not performed.[65]  The defendants do not contend that this precondition was unsatisfied.  The second precondition of Section 2 is that "the Loan Documents [defined as the Note and Mortgage] will not be modified unless and until (i) the

---

[60] HAMP Agreement at 1.
[61] Defs.' Mot. Summ. J. 4–5 n.1 (ECF No. 45).
[62] Nor did the defendants tell the Carsons that these reasons were grounds for rescinding the original Modification Agreement.
[63] Declaration of Nicole M. Gostebski, Ex. I, at 1 (ECF No. 46-1).
[64] HAMP Agreement at 1.
[65] Id. at 2.

Lender accepts this Agreement by signing and returning a copy of it to me."[66] Because none of the defendants ever signed and returned the Modification Agreement to the Carsons (as they were obligated to do),[67] they contend that an express precondition of the Modification Agreement was never satisfied, and therefore that the Modification Agreement never took effect.[68]

The plain language of the executed Commitment Letter and the Modification Agreement that accompanied it show that Litton made an offer and that the Carsons accepted it.[69]   There was a meeting of the minds, and no material terms and conditions are missing in the documents such as would prevent enforcement of that agreement.[70]   The defendants argue from Maine cases that there was no obligation until they actually signed and returned the Modification Agreement, an event that never occurred.   But those Maine cases dealt with situations where the parties were negotiating *in preparation for* a contract or where they were waiting for the written instrument to be drafted.[71]

---

[66] Id.; see also Defs.' SMF ¶ 39; Pls.' RSMF ¶ 39.

[67] The defendants did finally sign the Modification Agreement on July 8, 2016.  Pls.' RSAMF ¶ 52; Pls.' SMF ¶ 121; Defs.' RSMF ¶ 121.  The defendants argue that this evidence should be stricken under Federal Rules of Evidence 407 and 408.   I do not use the July 2016 signature in determining whether the original Modification Agreement was enforceable, see infra note 90.

[68] Defs.' Mot. Summ. J. 3–5 (ECF No. 45).

[69] See Restatement (Second) of Contracts § 212(2) (Am. Law. Inst. 1981) (if neither credibility of extrinsic evidence nor competing reasonable inferences are involved, "a question of interpretation of an integrated agreement is to be determined as a question of law"); see also id. cmt. e ("[A] question of interpretation is not left to the trier of fact where the evidence is so clear that no reasonable person would determine the issue in any way but one.").

[70] "A contract exists when the parties mutually assent to be bound by all its material terms, the assent is either expressly or impliedly manifested in the contract, and the contract is sufficiently definite."  McClare v. Rocha, 2014 ME 4, ¶ 16, 86 A.3d 22 (internal quotation marks omitted). "[A]llegations of a meeting of the minds, consideration, and mutuality of obligations state a legally enforceable contract."  Dom J. Moreau & Son, Inc. v. Fed. Pac. Elec. Co., 378 A.2d 151, 153 (Me. 1977).  In this case, consideration and mutuality of obligations are not in dispute.

[71] The defendants contend that the HAMP Agreement, rather than the Commitment Letter, constitutes the parties' contemplated agreement.  Defs.' Obj. to Pls.' Mot. Summ. J. 6–7 n.2 (ECF No. 51).   The Commitment Letter expressly states that it "contains our offer to modify the referenced loan" and "[w]hen signed by you, this letter will constitute your agreement to these

See, e.g., Masselli v. Fenton, 157 Me. 330, 335–36, 172 A.2d 728, 730–31 (1961); Mississippi & Dominion S.S. Co. v. Swift, 86 Me. 248, 29 A. 1063, 1067 (1894). Here, Litton made a fully detailed written offer, the Carsons accepted it in writing, and the Carsons did not attempt to change any of the terms that Litton offered. Once bankruptcy court approval was obtained, all the terms and conditions within the Carsons' control were satisfied. Since the offer was never withdrawn, the Servicer at that point was contractually obligated to sign the Modification Agreement.[72]   Indeed, Ocwen's 30(b)(6) designee Crystal M. Kearse testified at her deposition that the signature requirement is "normally . . . ministerial" and accomplished within 30 days after bankruptcy court approval is obtained.[73]

If there were any doubt about the Modification Agreement being effective after the bankruptcy court approval, the subsequent conduct of the parties in the bankruptcy court removes all doubt. Never did any of the defendants object to the Carsons' assertion that there was a new loan arrangement or object that Litton's accepted offer was no longer valid or had been withdrawn. The defendants complain that the Carsons' September 23, 2011, notice of their motion for bankruptcy court approval went to Litton rather than Ocwen (Ocwen

---

terms and conditions." Commitment Letter at 1. The Commitment Letter also directs the borrower to "send a signed original copy of this commitment letter by mail along with the signed modification agreement." Id. at 4. I therefore construe the Commitment Letter and the HAMP Agreement in tandem.

[72] This case is unlike Orcutt v. Feis, 298 A.2d 758, 759 (Me. 1973), where "[t]he record demonstrates the defendants' intention not to be contractually bound until a written instrument had been executed by all the parties, which was never done." Litton demonstrated its intention to be bound, but included a provision concerning *when* the Loan Documents would actually be modified.

[73] Crystal M. Kearse Dep. Tr. 87:15–88:6 (ECF No. 47-5). Although the Modification Agreement states that the Note and Mortgage will not be modified until the Servicer signs and returns a copy of the Modification Agreement to the Carsons and the Modification Effective Date [February 2, 2011] occurs, I conclude that the Servicer could be enjoined to fulfil its contractual obligation to sign. See Restatement (Second) of Contracts § 357 (Am. Law. Inst. 1981).

took over servicing the loan on September 1).   But notice of the bankruptcy court's approval of the Modification Agreement went to the lawyers for the Bank of New York, Litton's and Ocwen's principal, and no objection was forthcoming.[74] Nor would any objection be expected, since Litton had *directed* the Carsons to obtain bankruptcy court approval.   If that were not enough to show that there was an enforceable Modification Agreement,[75] in mid-2012 the Carsons moved for a bankruptcy court declaration that their mortgage was then current.[76] Notice of that motion did go to Ocwen, Ocwen did not object to the motion,[77] and the bankruptcy judge on August 20, 2012, determined that as of that date the Carsons were not in default or that all defaults had been cured.[78]   That could only be the case if the Modification Agreement was in effect.

The defendants' argument if accepted would make Litton's original offer wholly illusory.[79]   Simply by choosing not to sign the document—for no valid reason—the Servicer could revoke its detailed written offer that had been accepted.   That is not the law on offer and acceptance.[80]   Even Ocwen's corporate designee under Rule 30(b)(6) agreed that in the normal case signature is only a

---

[74] See Order on Motion to Approve Loan Modification With Request to Limit Notice, Pls.' SMF, Ex. 11 (ECF No. 47-11).

[75] The defendants argue that there was no enforceable Modification Agreement at the time the bankruptcy court approved it because they had not yet signed it.  Defs.' Mot. Summ. J. 4–5 (ECF No. 45).

[76] Pls.' SMF ¶ 62; Defs.' SMF ¶ 62.

[77] The Carsons had consented to Ocwen's Motion to Extend Time to Respond to the Motion to Determine Status of the Mortgage as Current in the bankruptcy court.  Pls.' SMF ¶ 67; Defs.' RSMF ¶ 67.

[78] Pls.' SMF ¶ 69; Defs.' SMF ¶ 69.

[79] Accord Wigod v. Wells Fargo Bank, N.A., 673 F.3d 547, 562–63 (7th Cir. 2012) (Illinois law) (the defendant's "proposed reading of Section 2 would nullify other express provisions" and "turns an otherwise straightforward offer into an illusion"); Barroso v. Ocwen Loan Servicing, LLC, 146 Cal. Rptr. 3d 90, 99–100 (Cal. Ct. App. 2012) (California law) (failure to send signed copy "is not a condition precedent barring formation of the binding modification agreement").

[80] See Restatement (Second) of Contracts §§ 22, 27 cmt. a.

ministerial event that occurs within 30 days of the bankruptcy court approval, and there is no conflicting evidence. The defendants have shown nothing abnormal about this case except Litton's and Ocwen's mistakes in coding the Carson loan after the offer was accepted. Subject to the fraud and misrepresentation dispute below, therefore, I conclude that the Modification Agreement was enforceable and that the Servicer could be compelled to sign it.[81]

The defendants argue that even if the Servicer's failure to sign the Modification Agreement does not make it unenforceable, the Carsons made material misrepresentations that produce the same result. Specifically, they point out that Mr. Carson testified at his June 8, 2016, deposition that at the time the Carsons requested the modification he was receiving a weekly $300 check from his employer as reimbursement for certain Medicare expenses he paid independently.[82] Mr. Carson did not disclose this $15,600 as annual income in his original Request for Modification and Affidavit or during the HAMP review process. The defendants contend that he therefore materially misrepresented his income to induce Litton to offer the Modification Agreement.[83] But there are genuine disputes of material fact on (1) whether the amount Mr. Carson received was per week or per month, *i.e.*, $3,600 or $15,600 annually; and (2) whether the amount was material to the HAMP decision.

On the first, the amount of the payment, the defendants can certainly use at trial Mr. Carson's June 8, 2016, deposition testimony and his failure to

---

[81] There is also a genuine dispute of material fact concerning whether the Carsons can show detrimental and justified reliance that would support a promissory estoppel claim against the defendants. See, e.g., Harvey v. Dow, 2011 ME 4, ¶ 12, 11 A.3d 303.
[82] Pls.' SMF ¶ 125; Defs.' RSMF ¶ 125.
[83] Defs.' Mot. Summ. J. 8–11 (ECF No. 45).

provide an errata sheet to correct it.  But there is conflicting evidence that the Carsons can rely on for the $300 payment frequency being *monthly* rather than weekly.  Over a year before the deposition, Mr. Carson had written Ocwen a letter on February 23, 2015, referring to this as a $300 *per month* reimbursement.[84]  On June 17, 2016, the Carsons' lawyer notified the defendants' lawyer that Mr. Carson had misspoken at his deposition.[85]   On July 1, the Carsons' lawyer produced in discovery to the defendants' lawyer a letter from Mr. Carson's financial advisor that Mr. Carson received a *monthly* $300 payment as reimbursement for medical insurance and an email from Mr. Carson's employer to the same effect.[86]  Mr. Carson should have filed an errata sheet to correct his deposition testimony, Fed. R. Civ. P. 30(e), and that failure can be used to challenge his credibility on the subject at trial.  See Glenwood Farms, Inc. v. Ivey, 229 F.R.D. 34, 35 (D. Me. 2005).  But it does not make his deposition statement a binding admission that he cannot contradict.  See 7-30 James Wm. Moore et al., Moore's Federal Practice ¶ 30.60 (3d ed. 2015); Elwell v. Conair, Inc., 145 F. Supp. 2d 79, 87 (D. Me. 2001).  Along with the documents I have listed, he has now filed a declaration that he was confused at his deposition and misstated the frequency of his reimbursement.[87]  It is true that the First Circuit has held that a party cannot use a later affidavit to contradict clear testimony at a deposition that would otherwise entitle the opposing party to summary judgment.

---

[84] Declaration of Bernard Carson ¶ 4 (ECF No. 50-6); Declaration of Bernard Carson, Ex. 1 (ECF No. 50-7).
[85] Declaration of Andrea Bopp Stark ¶ 5 (ECF 50-2).
[86] Declaration of Andrea Bopp Stark ¶ 7 (ECF No. 50-2); Declaration of Andrea Bopp Stark, Ex. 2 (ECF No. 50-4).
[87] Pls.' SMF ¶ 125; Declaration of Bernard Carson ¶¶ 5–11 (ECF No. 50-6).

Colantuoni v. Alfred Calcagni & Sons, Inc., 44 F.3d 1, 4–5 (1st Cir. 1994).  But that prohibition is in the absence of a "satisfactory explanation."  Id.  Mr. Carson has provided a satisfactory explanation here, and the amount of the undisclosed payment will be a matter for the jury to determine.

On materiality, the Carsons can argue to the jury that a $3,600 annual payment was not material to Litton's decision to offer them the Modification Agreement,[88] and that the omission of the $3,600 received was offset by simultaneous omission of his expenditures on health insurance premiums in approximately the same amount.[89]  The amount and materiality of the omission remain a jury issue.[90]

---

[88] Pls.' Obj. to Defs.' Mot. Summ. J. 12–15 (ECF No. 49).

[89] Mr. Carson's Declaration states that according to bank statements he submitted to Litton in 2010 he was paying AARP $307.70 per month for health insurance.  Declaration of Bernard Carson ¶ 7 (ECF No. 50-6).  The defendants agree that he did not indicate any monthly health insurance expenses on his HAMP Request for Modification and Affidavit.  Declaration of Nicole M. Gostebski, Ex. E (ECF No. 46-1).

[90] After learning of this payment issue, Ocwen nevertheless implemented most of the terms of the Modification Agreement in June 2016.  Pls.' SMF ¶ 120; Defs.' RSMF ¶ 120.  The defendants argue that I should not consider this later conduct because of Federal Rules of Evidence 407 and 408.  Defs.' Obj. to Pls.' Mot. Summ. J. 4 n.1 (ECF No. 51).  As to Rule 407, although there is disagreement among the Circuits, see 23 Charles Alan Wright & Arthur R. Miller, Federal Practice & Procedure § 5285 (4th ed. 2008); compare Reynolds v. Univ. of Pennsylvania, 483 F. App'x 726, 731–33 (3d Cir. 2012) and Pastor v. State Farm Mut. Auto. Ins. Co., 487 F.3d 1042, 1045 (7th Cir. 2007), with R.W. Murray, Co. v. Shatterproof Glass Corp., 758 F.2d 266, 274 (8th Cir. 1985), and Brazos River Auth. v. GE Ionics, Inc., 469 F.3d 416, 428–29 (5th Cir. 2006), and the First Circuit has not spoken, the plain language of Rule 407 does not apply to this contract dispute.  In any event, under Rule 407 a subsequent measure can be used to show feasibility.  I conclude that Ocwen's eventual decision to enter the Modification Agreement is not evidence that there was an earlier contract, but would be proper under Rule 407 to show that any misrepresentation by the Carsons was not material to the Servicer's decision whether to allow a modification.  The Rule 408 issue is more problematic.  But at this stage, the record does not tell me whether Ocwen's 2016 decision was part of a compromise or attempt at compromise.  The exact terms, and any relevant consideration involved, in the 2016 implementation of the Modification Agreement remain unclear.  See Pls.' SMF ¶¶ 120–21; Defs.' RSMF ¶¶ 120–21.  I decline to decide at this stage, therefore, whether the parties' 2016 modification would be inadmissible as evidence of "furnishing, promising, or offering—or accepting, promising to accept, or offering to accept—a valuable consideration in compromising or attempting to compromise the claim" under Federal Rule of Evidence 408.  See McInnis v. A.M.F., Inc., 765 F.2d 240, 246–51 (1st Cir. 1985).

Because the enforceability of the contract cannot be determined until the material misrepresentation issue is resolved, summary judgment is unavailable to both sides on the following claims:  violation of the bankruptcy stay; violation of the bankruptcy discharge; violation of the Maine UTPA; violation of RESPA; fraud; fraudulent misrepresentation; breach of contract; and promissory estoppel.  There is one exception, however.  Because it is undisputed that Bank of New York was a disclosed principal, while Litton and Ocwen were only its agents, the breach of contract and promissory estoppel claims can lie only against Bank of New York.[91]

I therefore **DENY** the plaintiffs' motion for summary judgment on Counts One, Two, Six, Seven, Nine, Ten, Eleven, and Twelve.  I **GRANT** summary judgment to the defendants Litton and Ocwen on Counts Eleven and Twelve, but otherwise **DENY** the defendants' motion for summary judgment on Counts One, Two, Six, Seven, Nine, Ten, Eleven, and Twelve.

### *Ocwen's Asserted Violations of the Fair Debt Collection Practices Act and the Maine Fair Debt Collection Practices Act*

Ocwen argues that it cannot be held liable under either the FDCPA or the MFDCPA because Ocwen was not a "debt collector" for the Carsons' loan.[92]  Both statutes exclude from their coverage anyone collecting or trying to collect a debt where the debt was not in default when that person or entity obtained it.  15 U.S.C. § 1692a(6)(F); 32 M.R.S. § 11003(7)(C).[93]

---

[91] See  Fitzgerald v. Hutchins, 2009 ME 115, ¶¶ 10-11, 983 A.2d 382; K & S Servs., Inc. v. The Schulz Elec. Grp. of Companies, 670 F. Supp. 2d 91, 94–95 (D. Me. 2009).  The plaintiffs' lawyer agreed at oral argument.

[92] Defs.' Mot. Summ. J. 12–14 (ECF No. 45).

[93] The FDCPA and MFDCPA provide similar definitions of "debt collector" for purposes of liability. Bank of Am., N.A. v. Camire, 2017 ME 20, ¶¶ 13, 19.

Relying on <u>Brown v. Morris</u>, 243 F. App'x 31, 34–35 (5th Cir. 2007), Ocwen contends that because its right to collect came from its acquisition of Litton in 2011, Ocwen did not "obtain" the debt while it was in default.   15 U.S.C. § 1692a(6)(F).  Rather, Ocwen says that as a consequence of its acquiring Litton, it should stand in Litton's place as the loan servicer.[94]  Thus, if the Carsons were not in default when Litton began servicing the mortgage in November 2008, Ocwen says that it should not be considered a "debt collector."

On this point, Ocwen points to Mr. Carson's deposition testimony that he did not default on his house payments in 2008.[95]  But the Carsons assert that Litton's records show that their account was in default in November 2008,[96] when Litton began servicing the account.  Mr. Carson has provided an affidavit in response to the defendants' motion for summary judgment stating that at the time of his deposition, he believed his statement was correct, but that upon reviewing Litton's records he understands that he was two months past due on November 4, 2008.[97]  Ocwen argues that I should not consider the late declaration on account of the <u>Colantuoni</u> decision I discussed earlier.  But there is already a genuine dispute over default because Litton's records conflict with Mr. Carson's testimony even if I ignore the late declaration.

Given the factual discrepancies in the record regarding the timing of the Carsons' default, I cannot determine whether Ocwen is a "debt collector" under

---

[94] Defs.' Mot. Summ. J. 12–14 (ECF No. 45); <u>see also</u> <u>Fenello v. Bank of Am., N.A.</u>, 926 F. Supp. 2d 1342, 1350–51 (N.D. Ga. 2013), <u>aff'd</u>, 577 F. App'x 899 (11th Cir. 2014).
[95] Defs.' RSAMF ¶ 2.
[96] Pls.' SAMF ¶ 2; Payment Reconciliation History, Pls.' SMF, Ex. 9 at 8 (ECF No. 47-9).
[97] Pls.' SAMF ¶ 14; Defs.' RSAMF ¶ 14; Declaration of Bernard Carson ¶ 11 (ECF No. 50-6).

the FDCPA or the MFDCPA.   Therefore, I **DENY** both the plaintiffs' and the defendant Ocwen's motion for summary judgment on Counts Three and Four.

### *Violations of the Maine Consumer Credit Code*

The MCCC provides that, in "attempting to collect an alleged debt arising from a consumer credit transaction, a person shall not . . . [d]isclose or threaten to disclose information concerning the existence of a debt known to be disputed by the debtor without disclosing that fact," 9-A M.R.S. § 9-403(1)(F), or "[c]laim, attempt or threaten to enforce a right that has been barred by law or a final order of the Supreme Judicial Court or a court of the United States," 9-A M.R.S. § 9-403(1)(G).  The Carsons argue that Ocwen violated 9-A M.R.S. § 9-403(1)(F) by reporting their loan as delinquent to credit reporting agencies without disclosing that the Carsons disputed the debt, and violated 9-A M.R.S. § 9-403(1)(G) by failing to comply with a Consent Judgment to which it was a party in the U.S. District Court for the District of Columbia.[98]   Ocwen argues that section 9-403(1)(F) is preempted and that section 9-403(1)(G) is inapplicable.

As to preemption, the federal Fair Credit Reporting Act (FCRA) provides that "[n]o requirement or prohibition may be imposed under the laws of any State with respect to any subject matter regulated under . . . section 1681s-2 of this title, relating to the responsibilities of persons who furnish information to consumer reporting agencies."   15 U.S.C. § 1681t(b)(1)(F).   Section 1681s-2 in

---

[98] The Consumer Financial Protection Bureau (CFPB), along with numerous state attorneys general and banking regulators, obtained a Consent Judgment against Ocwen and Ocwen Financial Corporation in Consumer Financial Protection Bureau v. Ocwen Financial Corp., No. 13-2025 (RMC) (D.D.C. Feb. 26, 2014), ECF No. 12.  Pls.' SMF ¶ 129; Defs.' RSMF ¶ 129.  The Amended Complaint enumerates only that Order as supporting the 9-403(1)(G) violation.  Am. Compl. ¶¶ 136–42 (ECF No. 13).  The Carsons' motion for summary judgment attempts to add two of the bankruptcy court orders, Pls.' Mot. Summ. J. 30–31 (ECF No. 38), but without an amended complaint to that effect, I do not consider them at this late stage.

turn provides that, "[i]f the completeness or accuracy of any information furnished by any person to any consumer reporting agency is disputed to such person by a consumer, the person *may not furnish the information to any consumer reporting agency without notice that such information is disputed* by the consumer."   15 U.S.C. § 1681s-2(a)(3) (emphasis added).   In short, section 1681s-2 "sets forth the duties of those who furnish consumer information to credit reporting agencies."   <u>Barrepski v. Capital One Bank</u>, 439 F. App'x 11, 12 (1st Cir. 2011).

This District has concluded that by virtue of the federal statute, MCCC provision 9-A M.R.S. § 9-403(1)(F) is preempted.   <u>Hamilton v. Fed. Home Loan Mortg. Corp.</u>, No. 2:13-cv-00414-JAW, 2014 WL 4594733, at *27 (D. Me. Sept. 15, 2014).   "15 U.S.C. § 1681t(b)(1)(F) supersedes any state law that would cover the subject matter of 15 U.S.C. § 1681s–2, which governs the responsibilities of persons who furnish information to consumer credit reporting agencies," <u>Hamilton</u>, 2014 WL 4594733, at *27, and 9-A M.R.S. § 9-403(1)(F) is a state law that "governs the responsibilities of persons who furnish information to consumer credit reporting agencies."   <u>See also</u> <u>Poulin v. The Thomas Agency</u>, 708 F. Supp. 2d 87, 90–91 (D. Me. 2010).   The Carsons have advanced no argument that 9-A M.R.S. § 9-403(1)(F) does not concern furnishers of information to credit reporting agencies or that it otherwise does not fall within the ambit of 15 U.S.C. § 1681s-2.[99]   Accordingly, I conclude that the FCRA preempts the Carsons' claim under 9-A M.R.S. § 9-403(1)(F).

---

[99] The Carsons attempt to circumvent the preemption argument by insisting that their MCCC "claim is premised on unconscionable practices in an attempt to collect a debt—Ocwen's coercive

For their claim under section 9-403(1)(G), the Carsons contend that Ocwen failed to comply with a provision of the D.C. District Court's Consent Judgment—specifically and only[100] the provision that Ocwen "cease all collection efforts while the borrower (i) is making timely payments under a trial loan modification."[101] But the Modification Agreement in this case, if it was enforceable, was never a *trial* loan modification.

I therefore **DENY** the plaintiffs' motion for summary judgment on Count V, and **GRANT** the defendants' motion on that count.

### *Intentional Infliction of Emotional Distress (IIED)*

To survive the defendants' motion for summary judgment on their IIED claim, the Carsons must show, among other things, that Ocwen and Bank of New York engaged in conducted that was "so extreme and outrageous as to exceed all possible bounds of decency and must be regarded as atrocious, utterly intolerable in a civilized community."  Lyman v. Huber, 2010 ME 139, ¶ 16, 10 A.3d 707 (quoting Curtis v. Porter, 2001 ME 158, ¶ 10, 784 A.2d 18).

---

conduct in trying to collect on the debt—and not specifically inaccurate credit reporting as governed by the FCRA."  Pls.' Obj. to Defs.' Mot. Summ. J. 22 (ECF No. 49).  9-A M.R.S. § 9-403(1)(F) provides no cause of action for "coercive conduct," and even if the Carsons had properly alleged such conduct, their MCCC claim would still be preempted by the FCRA.  The Carsons further argue that if their MCCC claim is preempted, they "still have a claim under the FDCPA, 15 U.S.C. § 1692e(8)."  Pls.' Obj. to Defs.' Mot. Summ. J. 22 (ECF No. 49).  Yet nowhere in their Amended Complaint, or otherwise in the record, have the Carsons alleged such a claim, and they cannot suddenly introduce a new cause of action for the first time in their objection to the defendants' motion for summary judgment.  Logiodice v. Trs. of Me. Cent. Inst., 170 F. Supp. 2d 16, 30 n.12 (D. Me. 2001), aff'd, 296 F.3d 22 (1st Cir. 2002).

[100] The Carsons have not argued that Ocwen violated the Consent Judgment's requirement that Ocwen "cease all collection efforts while the borrower . . . has submitted a complete loan modification application, and a modification decision is pending."  Settlement Term Sheet at A-25, Consumer Financial Protection Bureau v. Ocwen Financial Corp., No. 13-2025 (RMC) (D.D.C. Feb. 26, 2014), ECF No. 12-1.  They do argue that I should treat a permanent loan modification the same as a trial loan modification, Pls.' Mot. Summ. J. 30–31 (ECF No. 38), but the Consent Decree does not support that treatment.

[101] Am. Compl. ¶ 137 (quoting Consent Judgment, Consumer Financial Protection Bureau v. Ocwen Financial Corp., No. 13-2025 (RMC) (D.D.C. Feb. 26, 2014), ECF No. 12).

A court must "determine in the first instance whether the defendant's conduct may reasonably be regarded as so extreme and outrageous to permit recovery, or whether it is necessarily so." Champagne v. Mid-Maine Med. Ctr., 1998 ME 87, ¶ 16, 711 A.2d 842 (quoting Colford v. Chubb Life Ins. Co. of America, 687 A.2d 609, 616 (Me. 1996)).   Liability for IIED "clearly does not extend to mere insults, indignities, threats, annoyances, petty oppressions, or other trivialities."   Restatement (Second) of Torts § 46 cmt. d. (Am. Law. Inst. 1965).   Rather, an actionable case "is one in which the recitation of the facts to an average member of the community would arouse his resentment against the actor, and lead him to exclaim, 'Outrageous!'" Id.

The Carsons contend that Ocwen engaged in extreme and outrageous behavior by:   (1) miscoding the loan as a pending application when it began servicing the loan; (2) failing to implement the terms of the Modification Agreement after the bankruptcy court approved the loan modification; (3) failing to provide straightforward responses to Mr. Carson in his numerous calls regarding the implementation of the Modification Agreement; (4) failing to apply payments received from the Carsons in accordance with the terms of the Modification Agreement and the Chapter 13 Plan; (5) advising the Carsons that their loan was in default and could be referred for foreclosure despite the bankruptcy court's order determining the mortgage to be current in 2012; (6) failing to respond to letters the Carsons and their counsel sent regarding concerns with the implementation of the Modification Agreement; (7) sending misleading letters to the Carsons regarding the status of their payments; (8) misreporting the Carsons as late and past due to credit agencies; and

(9) encouraging the Carsons to apply for a new loan modification while simultaneously sending them notices of default.[102]

Ocwen's behavior toward the Carsons cannot be condoned.  The record shows that it failed to respond properly to the Carsons' multiple attempts to clarify the terms and implementation of the loan modification.[103]  Ocwen should have corrected the coding error on the loan, properly organized its files regarding the Carsons' HAMP application, and answered the Carsons' questions regarding the terms of the loan payment schedule in a more straightforward manner.

Yet Ocwen's behavior, "while troubling and unfortunate, cannot be characterized as 'so extreme and outrageous as to exceed all possible bounds of decency in a civilized community.'" Champagne v. Mid-Maine Med. Ctr., 1998 ME 87, ¶ 16, 711 A.2d 842.  The Carsons argue that Ocwen's conduct is similar to the "long litany of allegations" against the defendant bank in Hamilton v. Federal Home Loan Mortgage Corp., No. 2:13-cv-00414-JAW, 2015 WL 144562, at *3, *16 (D. Me. Jan. 12, 2015).[104]  In Hamilton, however, the bank's conduct was far more egregious.  It went to the extreme steps of posting foreclosure notices on the plaintiff's property, entering his home without consent, changing the locks on his home, and barring him from entering his home until new payment arrangements were made.  Hamilton, 2015 WL 144562, at *3.  It is true that Ocwen created several administrative hurdles in its discussions with the Carsons, but it did not physically intrude on their property or deny them entry into their home.

---

[102] Pls.' Obj. to Defs.' Mot. Summ. J. 32–33 (ECF No. 49).
[103] See Pls.' SMF ¶ 57; Defs.' RSMF ¶ 57.
[104] Pls.' Obj. to Defs.' Mot. Summ. J. 32–33 (ECF No. 49).

Rather, Ocwen's conduct is more like the defendant's actions in Beaulieu v. Bank of America, N.A., No. 1:14-cv-00023-GZS, 2014 WL 4843809, at *8 (D. Me. Sept. 29, 2014).  In that case, the defendant filed a foreclosure action without providing the required notice to the Veterans Administration.  This District ruled that the defendant's failed attempt at foreclosure, even if "wrongful and illegal . . . cannot be reasonably characterized as atrocious and utterly intolerable conduct sufficient to state an IIED claim."  Beaulieu, 2014 WL 4843809, at *8 (internal quotation marks omitted).  Similarly, in Fogg v. Ocwen Loan Servicing, LLC, No. 2:14-cv-454-GZS, 2015 WL 1565229, at *9 (D. Me. Apr. 8, 2015), the defendant sent the plaintiffs twelve debt collection demands during the time period from November 1, 2013 to January 4, 2015, inaccurately reported the plaintiffs' debt to credit agencies, and continued to send dunning notices even after the entry of a consent judgment, the recording of the discharge of the plaintiffs' mortgage, and the receipt of cease and desist letters from the plaintiffs' counsel.  Even then, this District distinguished Hamilton and dismissed the IIED claim, noting the lack of allegations that the defendant "set foot on the Foggs' property, posted any notices thereon, or even telephoned the Foggs."  Fogg, 2015 WL 1565229, at *10; see also Campbell v. Machias Sav. Bank, 865 F. Supp. 26, 36 (D. Me. 1994) (defendant's threats of foreclosure, filing a criminal complaint, and rude behavior were insufficient to state a claim for IIED).  More recently, in Cota v. U.S. Bank National Ass'n, No. 2:15-cv-486-GZS, 2016 WL 922784, at *9 (D. Me. Mar. 10, 2016), the plaintiffs alleged that the defendants threatened a foreclosure action, used threats of foreclosure to obtain additional cash payments from the plaintiffs, and completed the steps of filing a

foreclosure action.  Relying on <u>Beaulieu</u>, however, this District decided that although the plaintiffs "have alleged unsavory and perhaps legally actionable conduct, they have not satisfied the high bar of alleging conduct that could be 'reasonably characterized as atrocious and utterly intolerable,'" and dismissed the plaintiffs' IIED claim.  <u>Cota</u>, 2016 WL 922784, at *9.

I conclude that the Carsons "have alleged unsavory and perhaps legally actionable conduct" on the part of Ocwen, but they have not shown facts that satisfy the very demanding threshold for IIED's extreme and outrageous behavior.  <u>Id</u>.  Ocwen's conduct bears considerably more resemblance to threats of foreclosure, debt collection demands, inaccurate reporting to credit agencies, and the refusal to properly take notice of a consent judgment and cease and desist letters, than to <u>Hamilton</u>'s physically and emotionally demeaning steps of setting foot unannounced on the plaintiffs' property to post foreclosure notices and block them from their home.  Therefore, the defendants' motion for summary judgment on Count Eight is **GRANTED**.

### *Damages*

The defendants argue that the plaintiffs are not entitled to non-economic,[105] punitive,[106] emotional distress,[107] or statutory damages[108] on particular counts.  I note, but do not decide, that the Carsons may indeed be

---

[105] Defs.' Mot. Summ J. 19 (ECF No. 45).
[106] Defs.' Mot. Summ J. 19 (ECF No. 45).
[107] Defs.' Mot. Summ J. 20 (ECF No. 45).
[108] Defs.' Mot. Summ J. 23–27 (ECF No. 45).

eligible for non-economic,[109] punitive,[110] emotional distress,[111] and statutory damages[112] for at least some of their claims.  I therefore decline to strike any of the requests for damages awards at this stage.

### CONCLUSION

The plaintiffs' motion for summary judgment is **DENIED**, the defendants' motion for summary judgment is **GRANTED** on Counts V and VIII and on Counts XI and XII as to the defendants Litton and Ocwen, and is otherwise **DENIED**.

**SO ORDERED.**

**DATED THIS 29TH DAY OF MARCH, 2016**

/S/ D. BROCK HORNBY
**D. BROCK HORNBY**
**UNITED STATES DISTRICT JUDGE**

---

[109] See, e.g., Fleet Mortg. Grp., Inc. v. Kaneb, 196 F.3d 265, 269–70 (1st Cir. 1999) (concluding that non-economic damages may be recoverable under 11 U.S.C. § 362).

[110] See, e.g., Laux v. Harrington, 2012 ME 18, ¶ 35, 38 A.3d 318 (allowing punitive damages based on tortious conduct in cases where the defendant acted with malice).

[111] See, e.g., Sweetland v. Stevens & James, Inc., 563 F. Supp. 2d 300, 304 (D. Me. 2008) (indicating that emotional distress damages may be recoverable under the FDCPA and MFDCPA).

[112] See, e.g., French v. Corp. Receivables, Inc., 489 F.3d 402, 403 (1st Cir. 2007) (recognizing that the FDCPA provides that successful plaintiffs are entitled to statutory damages).